BLACKFEET NATIONAL BANK, American Deposit Corp., Plaintiffs-counterdefendants-Appellants,

v.

Bill NELSON, as Treasurer and Insurance Commissioner of the State of Florida, Defendant-counterclaimant-Appellee.

No. 96-3021.

United States Court of Appeals,

Eleventh Circuit.

April 5, 1999.

Appeal from the United States District Court for the Northern District of Florida. (No. 94-40496-WS), William Stafford, Judge.

Before TJOFLAT, BIRCH and MARCUS[*], Circuit Judges.

TJOFLAT, Circuit Judge:

Blackfeet National Bank, a national bank located in the State of Montana, issues a product called the "Retirement CD" to the public. As part of its marketing efforts, Blackfeet has advertised these CDs in the *Wall Street Journal.* The Insurance Commissioner for the State of Florida, contending that offering the Retirement CD involves engaging in the business of insurance, commenced administrative proceedings against Blackfeet under the Florida Insurance Code. In response, Blackfeet sued the Insurance Commissioner, seeking a declaratory judgment that its sale of the Retirement CD was authorized by the National Bank Act (the "Bank Act"), 12 U.S.C. §§ 21-216d (1994). The district court, concluding that state regulation of the Retirement CD was permitted by the reverse preemption provisions of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (1994), rejected Blackfeet's position and granted the Insurance Commissioner summary judgment. We affirm.

I.

---

[*]Honorable Stanley Marcus was a U.S. District Judge for the Southern District of Florida, sitting by designation as a member of this panel, when this appeal was argued and taken under submission. On November 24, 1997, he took the oath of office as a United States Circuit Judge of the Eleventh Circuit.

Blackfeet National Bank entered into a licensing agreement with American Deposit Corporation ("ADC") to obtain marketing rights to a new banking industry product, the Retirement CD. A customer desiring to purchase the Retirement CD makes an initial deposit with Blackfeet. At the time of the initial deposit, the customer chooses a maturity date. The customer also chooses a period, from one to five years, during which the interest rate for the Retirement CD remains fixed. Thereafter, until the maturity date, the interest rate fluctuates in accordance with the cost of funds (but never falling below three percent). The customer has the option to make limited additional deposits into the Retirement CD account prior to the maturity date.

Upon maturity, the customer may make a one-time withdrawal of up to two-thirds of the balance in the Retirement CD account. The balance remaining after this initial withdrawal is disbursed to the customer in equal periodic payments for the remainder of his life. Even in the event that the Retirement CD account reaches a zero balance, the customer continues to receive the same periodic payments until death. On the other hand, should the customer die before full payment of the principal in the Retirement CD account (as determined at the maturity date), the remainder of the principal is paid to the customer's estate. To minimize the mortality risk it assumes, Blackfeet determines the amount of the periodic payments to its customers by using actuarial tables.

Under its agreement with ADC, Blackfeet obtained a non-exclusive license to market the Retirement CD throughout the United States. As part of its marketing efforts, Blackfeet placed an advertisement for the Retirement CD in the *Wall Street Journal*.[1] In response to this advertisement, Tom Gallagher,[2] the Insurance Commissioner of Florida (the "Commissioner"), began administrative proceedings against Blackfeet and ADC. The Commissioner maintained that the Retirement CD was in essence an insurance product, and that

[1]This advertisement appears to be the only contact between Blackfeet and the State of Florida. There is no evidence in the record indicating that any citizen of Florida purchased a Retirement CD or otherwise responded to the advertisement.

[2]Gallagher also served as the Treasurer of Florida. He has since been replaced by Bill Nelson, who has therefore been substituted for Gallagher as the plaintiff-appellee in this case.

marketing it through the national media constituted participation in the business of insurance in Florida—in violation of Florida law. After the Commissioner commenced those proceedings, Blackfeet and ADC brought this suit.[3] Citing a letter from the Office of the Comptroller of the Currency (the "Comptroller") permitting (by not precluding) Blackfeet's issuance of the Retirement CD, Blackfeet and ADC urged the court to declare that the Commissioner lacked authority to regulate such issuance.[4] Concluding that the letter did not foreclose state regulation of the Retirement CD as insurance, the district court entered summary judgment for the Commissioner. Blackfeet and ADC (collectively "Blackfeet") then lodged this appeal.

## II.

The district court decided this case on the cross-motions of both parties for summary judgment. As the only issues in dispute involve questions of law, we review the district court's judgment *de novo.* *See Lasche v. George W. Lasche Basic Profit Sharing Plan,* 111 F.3d 863, 865 (11th Cir.1997).

## III.

Our analysis of this matter involves several inquiries. In part III.A, we address the reasonableness of the Comptroller's "no objection" letter with respect to Blackfeet's issuance of the Retirement CD. In part III.B, we assume *arguendo* that the Comptroller's determination was reasonable and examine the relationship between a federal law permitting the issuance of the Retirement CD by Blackfeet and a Florida law prohibiting the participation of banks in the business of insurance. We focus our attention in this part on the application of the McCarran-Ferguson Act, and in that regard we conduct a three-pronged inquiry: "(1) whether the pertinent sections of the [Florida Code] were enacted 'for the purpose of regulating the business of insurance'; (2) whether the Retirement CD is properly considered 'the business of insurance'; and (3)

---

[3]Blackfeet and ADC sued the Commissioner in the United States District Court for the District of Montana. On the Commissioner's motion, that court transferred the case to the Northern District of Florida.

[4]The Comptroller filed a brief in this case as *amicus curiae.* Also filing briefs as *amici curiae* were the American Bankers Association et. al, the New York Clearing House Association, the National Association of Life Underwriters, and the American Council of Life Insurance.

3

whether the pertinent provisions of the Bank Act 'specifically relate to the business of insurance.' " *American Deposit Corp. v. Schacht,* 84 F.3d 834, 838 (7th Cir.1996).

A.

Blackfeet argued to the district court that it was authorized under the Bank Act to issue the Retirement CD. Blackfeet supported its argument with a determination by the Comptroller that issuance of the Retirement CD is an authorized bank activity.[5] The district court, accepting as reasonable the interpretation of the Comptroller, held that the Bank Act authorized Blackfeet's actions with respect to the issuance of the Retirement CD. We disagree.

Prior to placing its ad in the *Wall Street Journal,* Blackfeet notified the Comptroller of its intention to market the Retirement CD to the public. The Comptroller in turn sent Blackfeet what was in essence a "no objection"[6] letter, which in effect authorized Blackfeet to move forward with its plans. The Comptroller concluded that the Retirement CD was a financial product of the kind normally offered by banking institutions, and that its "primary attributes [were] grounded in the Bank's expressly authorized powers."

---

[5]Blackfeet also cited as support a letter from the Federal Deposit Insurance Corporation ("FDIC"), which concluded that the Retirement CD was a bank deposit that was fully insured (to $100,000) up to its maturity date, with the insurance thereafter limited to the amount of principal remaining in the Retirement CD (i.e., as the amount of principal decreased through payments, the amount of insurance correspondingly decreased). Because the FDIC fully insures the Retirement CD through maturity, Blackfeet argues, it is properly characterized as a bank deposit. That argument, however, demonstrates a fundamental flaw in Blackfeet's reasoning. We cannot decide the nature of this instrument at its maturity date any more than a referee could decide the winner of a basketball game at halftime. We must also examine how the FDIC would treat the periodic payments after maturity. The FDIC has stated in its letter to Blackfeet that "[u]nder no circumstances would FDIC insurance extend to the bank's commitment to make lifetime payments, as the value of such payments is uncertain and may exceed the total account balance." Because the lifetime payment provision is the Retirement CD's "selling" feature, the fact that the FDIC will not insure those periodic payments demonstrates the differences between a bank deposit and the Retirement CD—not the similarities.

[6]Often, national banks will solicit guidance from the Comptroller as to whether a particular practice is permitted under the Bank Act. If there are no specific problems with the activity, the Comptroller may send the inquiring bank a "no objection" letter. This letter does not represent formal approval of the practice—only an assurance that the Comptroller would not challenge the bank's activity. The Comptroller may condition the "no objection" letter on the bank's commitment to address consumer protection concerns.

4

According to the Comptroller, those powers included the power "to receive deposits and enter into contracts, coupled with its powers to incur liabilities and fund its operations." 12 U.S.C. § 24(Third),(Seventh) (1994).

The Supreme Court has addressed the authority of the Comptroller to interpret and apply the provisions of the Bank Act. In *NationsBank of North Carolina, N.A. v. Variable Annuity Life Insurance Co.,* 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995), the Court reviewed the Comptroller's decision permitting banks to act as agents selling annuities for insurance companies. The Comptroller, as the chief administrator charged with the supervision of national banks, determined that the Bank Act authorized national banks to broker annuities. *See id.* at 254, 115 S.Ct. at 812. As part of this determination, the Comptroller concluded that annuities were not "insurance" within the meaning of section 13[7] of the Bank Act, 38 Stat. 251, 264 (1913) (codified as amended at 12 U.S.C. § 92 (1994)). *See id.* at 255, 115 S.Ct. at 812-13. Several insurance companies challenged this conclusion, arguing that annuities were insurance and that the Comptroller's interpretation that they were within the business of banking under the Bank Act was unreasonable.

In reaching its decision, the Court first discussed the proper inquiry for assessing the reasonableness of an administrative interpretation of a statute. *See id.* at 257, 115 S.Ct. at 813. The first prong of the inquiry tests the intent of Congress; if Congress' intent is clear, "that is the end of the matter." *See id.* (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). If the statute is ambiguous, however, a second inquiry is required to test the reasonableness of the administrator's interpretation. *See id.* "If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment 'controlling weight.' " *Id.* at 257, 115 S.Ct. at 813-14 (quoting *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782).

---

[7]Section 13 provides that national banks located in towns with a population of 5000 or less may act as agents for insurance companies. *See* 12 U.S.C. § 92 (1994). That provision necessarily implies that these same banks are not authorized to act as agents for insurance companies if the banks are located in cities larger than 5000 in population.

5

Applying that two-part test to the facts, the *NationsBank* Court found first that the Bank Act permits activities beyond those enumerated in the statute (thereby making it ambiguous), and second that the Comptroller's interpretation of the statute as permitting banks to broker annuities for insurance companies was a reasonable interpretation deserving of the Court's due deference. In reaching this conclusion, the Court specifically accepted the Comptroller's view that "for the purpose at hand, annuities are properly classified as investments, not 'insurance.' " *Id.* at 261, 115 S.Ct. at 815. The Comptroller compared putting money in an annuity to putting money in a bank account or a mutual fund; they all answer financial needs in a way authorized by the Bank Act. Therefore, according to the Comptroller, the actions of NationsBank were permitted as an " 'incidental powe[r] ... necessary to carry on the business of banking.' " *Id.* at 260, 115 S.Ct. at 815.

Blackfeet cites *NationsBank* in support of its argument that the Bank Act permits a national bank to market the Retirement CD.[8] The district court accepted Blackfeet's argument, concluding that the Comptroller's no objection letter offered a reasonable interpretation of the provisions of the Bank Act. The district court acknowledged that the Comptroller took into consideration the fact that payouts would be made based on actuarial tables. In fact, the Comptroller mandated procedures to mitigate the risks involved in such a payout structure. The court agreed with the Comptroller that the Retirement CD was in fact a "deposit," and that it "represent[ed] the very essence of banking which is embodied in a bank's express authority to accept deposits and enter into contracts, and authority to incur liabilities and fund its operation." The court therefore concluded that despite the risk shifting characteristics of the Retirement CD, its nature was that of a deposit and thus its issuance was within Blackfeet's powers under the Bank Act.

---

[8]The Seventh Circuit has had occasion to address the very issue we face today. *See American Deposit Corp. v. Schacht,* 84 F.3d 834 (7th Cir.1996). That court, however, declined to address whether the Bank Act authorized the issuance of the Retirement CD by a national bank when it considered the nature of the Retirement CD. Rather, it accepted for argument's sake that the Bank Act did authorize Blackfeet's actions, and proceeded with its analysis of whether an Illinois insurance regulation nevertheless trumped the Bank Act because of the reverse-preemption provisions of the McCarran-Ferguson Act. *See id.* at 837.

6

We reject this reasoning and conclude that the Comptroller's interpretation of the Bank Act is an unreasonable expansion of the powers of national banks beyond those intended by Congress. The district court's reliance on *NationsBank* is misplaced, as that case is limited by its facts. Of course, the *NationsBank* Court did conclude that annuities were not insurance "for the purpose at hand." *See NationsBank,* 513 U.S. at 261, 115 S.Ct. at 815. However, in *NationsBank,* the inquiry focused on the ability of a national bank to *broker* annuities; our case turns on the ability of national banks to *underwrite* the Retirement CD. In determining whether a national bank was authorized to market such a product, the Court as much as admitted the distinction we make today when it highlighted the Comptroller's assurance that "NationsBank 'will act only as agent [and] will not have a principal stake in annuity contracts and therefore will incur no interest rate or actuarial risks.' " *Id.* at 260 n. 4, 115 S.Ct. at 815 n. 4. It is clear from the facts before us that Blackfeet will engage in underwriting the Retirement CD—something the *NationsBank* Court implied would "deviate from traditional bank practices." *Id.*

Aside from this clear—and compelling—factual distinction, there is a more basic and fundamental argument against the reasonableness of the Comptroller's interpretation. The primary purpose of state regulation of insurance—at least arguably—is the prevention of insolvency. *See First Nat'l Bank of E. Ark. v. Taylor,* 907 F.2d 775, 780 (8th Cir.1990) (" 'The prevention of insolvency and the maintenance of "sound" financial condition in terms of fixed-dollar obligations is precisely what traditional state regulation [of insurance] is aimed at.' " (*quoting SEC v. Variable Annuity Life Ins. Co. of Am.,* 359 U.S. 65, 90-91, 79 S.Ct. 618, 631-32, 3 L.Ed.2d 640 (1959) [hereinafter *VALIC* ] )). Underlying this concern over insolvency is the understanding that, for many reasons, the nature of insurance lends itself to the possibility of substantial abuse.[9] As a result, we have acknowledged the push for special regulation of the insurance industry, with the

___

[9]Insurance involves risk shifting, whereby premiums paid by policy holders (along with interest from those premiums) are used to pay the claims of other policy holders. In essence, the provider pays present claims with proceeds from past and present premiums, while those who pay premiums now will have their future claims satisfied from the proceeds of future premiums. To insure solvency of the system, certain precautions must be taken by providers so that funds will be available to pay all submitted claims in the future. Should a provider redirect the premiums as part of a scheme of embezzlement, or even if the

fundamental goal being " 'the protection of solvency of the insurance industry, and the prevention of coercion, which in turn protects all potential, present and future policyholders.' " *Barnett Bank of Marion County, N.A. v. Gallagher,* 43 F.3d 631, 636 (11th Cir.1995) (quoting *Barnett Banks of Marion County, N.A. v. Gallagher,* 839 F.Supp. 835, 842 (M.D.Fla.1993)), *overruled on other grounds sub. nom., Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996).

It is exactly the risk shifting and use of actuarial tables present here—in other words, the underwriting—that necessitates the exclusion of the Retirement CD from the business of banking and its inclusion in the business of insurance. We need look no further than the Bank Act's treatment of another form of underwriting to support this argument. Section 24 of the Bank Act states that a national bank shall have the power to deal in securities and stock, but that

> [t]he business of dealing in securities and stock by the [bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the [bank] shall not underwrite any issue of securities or stock....

12 U.S.C. § 24(Seventh); *see also NationsBank,* 513 U.S. at 256, 115 S.Ct. at 813 (quoting language of the statute).

This section of the Bank Act was amended by section 16 of the Glass-Steagall Banking Act of 1933, 48 Stat. 162, 184 (codified as amended at 12 U.S.C. § 24(Seventh)). The reasons for the amendment were many, but most centered around the desire to prevent in the future the damage done to national banks by the then recent collapse of the stock market. Congress was concerned not only about the obvious danger to a bank's deposit accounts caused by its investment in speculative securities; it also was concerned about the indirect pressure that involvement in securities investment would cause. *See Investment Co. Inst. v. Camp,* 401 U.S. 617, 631, 91 S.Ct. 1091, 1099, 28 L.Ed.2d 367 (1971) ("Moreover, the pressure to sell a particular investment and to make the affiliate successful might create a risk that the bank would make its credit

---

provider merely mismanages the present assets of the company, the future solvency of the system is in jeopardy.

8

facilities more freely available to those companies in whose stock or securities the affiliate has invested or become otherwise involved.").  In short, it was feared that permitting banks to invest in securities "might impair [the bank's] ability to function as an impartial source of credit." *Id.* Similar concerns have been raised regarding a bank's engagement in the business of insurance.  *See Barnett Bank,* 43 F.3d at 636 ("[Solvency of insurance companies] could be threatened by pressures to make improper insurance decisions.  This pressure could force an insurer to assume a bad risk to quickly consummate a bank loan, or could push a bank customer to take out unnecessary insurance where the bank's only motive is profit.").  Both the business of insurance and investment in securities involve the same dangers with respect to a bank's involvement in them.

While the underwriting of insurance and securities have different qualities, both involve the fundamental feature of *guarantying* payment of proceeds.  Those underwriting the issuance of a security guaranty that a certain amount of proceeds will be distributed to the issuer on a certain date (whether or not the underwriter is able to successfully market those securities), while the underwriters of insurance guaranty the distribution of proceeds contingent upon the occurrence of a specific event.  Both involve placing their customer's assets at risk, at least to a certain extent.  That being the case, it seems unreasonable to interpret the Bank Act impliedly to permit underwriting in one instance (Retirement CD) while expressly prohibiting it in another (securities).  We therefore conclude that the Comptroller's determination that the Bank Act permits the issuance of the Retirement CD is unreasonable.  Because the Bank Act may not be interpreted to authorize Blackfeet's issuance of the Retirement CD, the Commissioner may regulate the issuance of the Retirement CD under applicable Florida laws and regulations.

B.

Our conclusion that the Comptroller unreasonably expanded the powers of a national bank through its "no objection" letter to Blackfeet is a sufficient ground on which to affirm the district court, despite the fact that the district court did not rely on this ground.  *See Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290 n. 50 (11th Cir.1998) (concluding that this court may affirm a district court's

9

judgment on any ground, regardless of whether that court addressed, adopted or rejected that ground in reaching its decision). There is, however, an alternative reason for affirming the district court's decision. Assuming *arguendo* that the Bank Act permits national banks to market the Retirement CD, we conclude that the McCarran-Ferguson Act nonetheless enables the State of Florida to regulate the issuance of the Retirement CD in Florida. McCarran-Ferguson reverses the doctrine of preemption in cases involving state insurance laws, such that a state law specifically regulating the business of insurance shall preempt a conflicting federal law unless that federal law specifically relates to the business of insurance.[10] *See United*

---

[10]There has been some suggestion that the McCarran-Ferguson reverse preemption provisions should not apply in the context of the Bank Act, because the Bank Act was by its nature intended to preempt all conflicting state laws. In other contexts, federal laws involving issues of paramount national concern—such as the Foreign Sovereign Immunities Act (FSIA) and the Civil Rights Act of 1964 (Title VII)—have been held to be exempt from the reverse preemption provisions of McCarran-Ferguson. *See Stephens v. National Distillers & Chem. Corp.,* 69 F.3d 1226, 1231 (2d Cir.1995) (concluding that the FSIA preempts McCarran-Ferguson because its international law origins are "so different from the kind of congressional statutory action that the [Act] was enacted to deal with ..."); *Spirt v. Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1065 (2d Cir.1982), *vacated,* 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), *reinstated as modified,* 735 F.2d 23 (2d Cir.1984) (concluding that McCarran-Ferguson was not meant to preempt subsequently enacted civil rights laws that conflicted with the business of insurance). We find the Bank Act to be of a different nature from statutes that involve issues of paramount national concern, making it reasonable to conclude that the Bank Act should be subject to McCarran-Ferguson's reverse preemption provisions. While we do not wish to diminish the importance of any action of Congress, we conclude that the Bank Act, given its nature as a strictly domestic set of purely economic regulations, does not reflect the same degree of national concern as FSIA or Title VII. *Cf. Stephens,* 69 F.3d at 1232.

Furthermore, the Supreme Court's analysis in *Barnett Bank* indicates that the Bank Act is in fact the type of congressional statutory action that McCarran-Ferguson was designed to address. *See Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 38, 116 S.Ct. 1103, 1111, 134 L.Ed.2d 237 (1996); *see also Schacht,* 84 F.3d at 843-44 ("*Barnett Bank* demonstrates that the Bank Act possesses no unique immunity from the McCarran-Ferguson Act."). In *Barnett Bank,* the Supreme Court addressed the authority of national banks to sell insurance in towns with a population of under 5000. The Court determined that section 13 of the Bank Act " 'specifically relate[d] to the business of insurance' [and that] therefore the McCarran-Ferguson Act's special anti-pre-emption rule [did] not apply." *Barnett Bank,* 517 U.S. at 38, 116 S.Ct. at 1111. Had the Court interpreted the Bank Act to carry the importance of Title VII, it could have disposed of Nelson's arguments in *Barnett Bank* by concluding that the Bank Act was not subject to the provisions of McCarran-Ferguson. That it did not suggests that in other circumstances the Bank Act could be subject to those reverse-preemption provisions. We therefore find *Stephens* and *Spirt,* which involved statutes that would never be subject to such preemption, distinguishable from this case.

*States Dept. of the Treasury v. Fabe,* 508 U.S. 491, 507, 113 S.Ct. 2202, 2211, 124 L.Ed.2d 449 (1993). In part III.B.1, we briefly discuss McCarran-Ferguson in order to provide context for the analysis that follows. In part III.B.2, we address the question of whether Blackfeet's involvement with the Retirement CD constitutes the business of insurance. In part III.B.3, we determine whether the provisions of the Bank Act in question specifically relate to the business of insurance.[11]

1.

The McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (1994), was passed by Congress in 1945 in order to make it clear that states generally retained the power to regulate the business of insurance. The Act was passed in response to the Supreme Court's decision in *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which applied federal antitrust laws to insurance companies engaged in interstate commerce. *See Stephens v. National Distillers & Chem. Corp.,* 69 F.3d 1226, 1230 (2d Cir.1995). Prior to *South-Eastern Underwriters,* it had been widely assumed that those transactions involving the business of insurance were not subject to federal regulation as interstate commerce. *See Fabe,* 508 U.S. at 499, 113 S.Ct. at 2207. After *South-Eastern Underwriters,* insurers and states alike were uncertain as to who held the power to tax and regulate the insurance industry. *See id.* Their concern was that because the business of insurance was now considered interstate commerce, ordinary supremacy rules would curtail a state's ability to regulate insurance companies as they had in the past. *See id.* at 499-500, 113 S.Ct. at 2207. Congress quickly enacted McCarran-Ferguson in order to restore state supremacy in this context. *See id.* at 500, 113 S.Ct. at 2207.

McCarran-Ferguson states, in relevant part:

(a) State regulation

---

[11]Parts III.B.2 and III.B.3 involve the second and third prongs of the three-pronged inquiry mentioned earlier. The first prong—whether the Florida statute in question was enacted "for the purpose of regulating the business of insurance"—is so obviously satisfied by the statute in question as to deserve no discussion.

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) Federal regulation

No Act of Congress shall be construed to invalidate, impair, or supercede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance....

15 U.S.C. § 1012. Those two provisions act to reverse the ordinary preemption rules with respect to conflicting state and federal laws affecting the business of insurance. Specifically, they operate in tandem to fulfill the intent of Congress—to defer to state systems of insurance regulation—by (1) expressly declaring that state regulation of insurance is in the public interest; and (2) " 'removing obstructions which might be thought to flow from [Congress'] own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation.' " *Fabe,* 508 U.S. at 500, 113 S.Ct. at 2207 (quoting *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 429-30, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342 (1946)).

2.

The first issue we must resolve in applying the Act here is whether Blackfeet's issuance of the Retirement CD is properly characterized as the business of insurance. The meaning of "insurance" in the context of McCarran-Ferguson is a federal question. *See VALIC,* 359 U.S. at 69, 79 S.Ct. at 621.

Blackfeet would have us assign the "annuity" label to the Retirement CD and thereafter endorse a general rule that annuities are not the business of insurance. Blackfeet cites for support *NationsBank,* which stated that "for the purpose at hand, annuities are properly classified as investments, not 'insurance.' " *NationsBank,* 513 U.S. at 261, 115 S.Ct. at 815. As we concluded earlier, however, underwriting an annuity is of a different nature than brokering an annuity, and therefore *NationsBank* is distinguishable from the case at hand. Furthermore, our reading of *NationsBank* leads us to the conclusion that the Court did not intend a hard and fast rule regarding annuities, but rather acknowledged the need to analyze the issue on a case by

12

case basis.[12] Both the Comptroller's assurance in *NationsBank* that the bank would not "have a principal stake in the annuity contracts," *see id.* at 260 n. 4, 115 S.Ct. at 815 n. 4, and the clause, "for the purpose at hand," support that reading. As such, we decline to apply an ambiguous label and engage in an abbreviated analysis for which our factual scenario appears ill-fitted.

Instead, we must analyze the general principles that help to define "the business of insurance." The Supreme Court first addressed this phrase in *SEC v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). There, the Court found that such things as "[t]he relationship between insurer and insured, the type of policy which could be issued, and [that policy's] reliability, interpretation, and enforcement ... were [at] the core of the 'business of insurance.' " *Id.* at 460, 89 S.Ct. at 568. Although the Court noted that other activities of companies could find their way under the umbrella of "business of insurance," the focus of that phrase "was on the relationship between the insurance company and the policyholder." *Id.* at 460, 89 S.Ct. at 568-69; *see also Fabe,* 508 U.S. at 501, 113 S.Ct. at 2208 (supporting that interpretation of "business of insurance"). Also important in defining something as "insurance" is whether the activity involves the underwriting of risk. *See VALIC,* 359 U.S. at 72-73, 79 S.Ct. at 622-23. The *VALIC* Court stated that " 'true underwriting of risks [is] the one earmark of insurance.' " *Id.* at 73, 79 S.Ct. at 623.

These general principles make up the foundation of a three-part test articulated by the Supreme Court for determining whether an activity constitutes part of the business of insurance: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited

---

[12]We note that an almost endless array of products presently fall under the heading of annuities. There are fixed annuities and variable annuities, annuities for a term of years and annuities for the life of the annuitant. There are even annuities payable to a beneficiary for the life of another. Some of these annuities resemble a certificate of deposit with almost no traits of insurance, while others are almost indistinguishable from insurance. Given the wide range of possibilities, it would be unwise for us to force them all into one category for the purpose of determining what is and what is not the business of insurance.

to entities within the insurance industry." *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982) (emphasis omitted).[13] Each of these criteria works in tandem with the others, and "[n]one of these criteria is necessarily determinative in itself." *Id.* After examining the Retirement CD under those three criteria, we find that it is part of the business of insurance.

First of all, it is clear that the Retirement CD involves the spreading—or underwriting—of a policy holder's risk. Although Blackfeet argues that "[t]he hazard of having insufficient investment acumen to outlive an asset ... is an *investment* risk, like the risk of misjudging whether a stock will go up or down," this argument mischaracterizes the risk. What purchasers are protecting against is simply the risk of outliving their means. In order to limit that risk, they purchase the Retirement CD, which ensures that they will receive periodic payments for life. Blackfeet assumes this risk for the policy holder in return for the fees it collects and the interest it draws from the use over time of their contributions. It uses standard actuarial tables in order to limit its exposure to these mortality risks.

We frankly do not see the difference between insuring against living too long (which in essence is what this Retirement CD provides for) and insuring against dying too soon. Moreover, we note that other insurance products—"collision" car insurance, for example—operate in exactly the same fashion as the Retirement CD; essentially, they protect the insured from his own insufficient acumen in other contexts. We therefore find Blackfeet's arguments unpersuasive and conclude that this practice is properly characterized as underwriting a policyholder's risk.

---

[13]*Pireno* addresses the second clause of § 1012(b) of the Act (dealing specifically with antitrust immunity), while our concern is with the first clause of § 1012(b) (addressing federal regulation of insurance generally). We understand the distinction made by the *Fabe* Court between the "business of insurance" (antitrust clause) and "laws enacted for the purpose of regulating the business of insurance" (general clause), *see Fabe,* 508 U.S. at 504, 113 S.Ct. at 2209-10, but that distinction is inapposite to our case. We merely need to determine whether offering the Retirement CD to the public constitutes the "business of insurance." We cannot imagine that "business of insurance" could have two different meanings in the same statutory subsection, and therefore we find it appropriate to use the *Pireno* test in making our determination.

As to the second prong of the *Pireno* test, it is clear that Blackfeet's sale of the Retirement CD is "an integral part of the policy relationship between the insurer and the insured." *Id.* at 129, 102 S.Ct. at 3009. In fact, as the *Schacht* court pointed out, "[the Retirement CD] is not only an 'integral part' of the policy relationship between the insurer and the insured, it is the very document that evidences that relationship." *Schacht,* 84 F.3d at 842. We cannot imagine anything more integral to the insurer/insured relationship.

Finally, the sale of the Retirement CD satisfies the third prong of the *Pireno* test. While being careful not to label the Retirement CD, we note that the vast majority of annuities—to which the Retirement CD is similar—are issued by insurance companies. *See id.* The *Schacht* court, citing a 1994 *Barron's* article, noted that "nearly all of the $1 trillion worth of annuities currently in effect in the United States are issued by regulated insurance companies." *Id.* This information appears to indicate that the issuance of annuities is limited to entities within the insurance industry.

Blackfeet makes the point that thousands of "gift annuities" are issued each year by charitable organizations in the form of charitable remainder annuity trusts. *See* I.R.C. § 664 (1994). Given this fact, it argues, annuities cannot be deemed to be limited to the insurance industry. We disagree. Charitable organizations repeatedly have received special consideration from the Congress and the Internal Revenue Service. *See id.* The mere fact that they have been permitted to issue gift annuities should not be read to grant a general power to any entity to do the same.

We do acknowledge that the 1990s have witnessed an expansion of bank participation in the brokering of annuities, supported both by the Comptroller and the Supreme Court. *Cf. NationsBank,* 513 U.S. at 261, 115 S.Ct. at 815. A recent newswire report indicated that bank activity in the United States insurance industry will grow by almost one-third annually over the next four years, due in large part to the sale of annuities. *See Xinhua World Econ. News Summary at 0500 GMT,* Xinhua Eng. Newswire, Nov. 27, 1998. These facts, however, speak only to brokering annuities. They do not indicate an increase in underwriting insurance products by banks, which is the practice being scrutinized here. Furthermore, we have found no

commercial examples where any entity other than an insurance company has underwritten this type of product (meaning a product similar to a fixed-rate life annuity). That being the case, we conclude that the third prong of *Pireno* 's test is satisfied.[14]

As we stated earlier, the *Pireno* test does not turn on any one of its factors; rather, each of the factors is analyzed in context with the others. The facts in this case, when examined under the *Pireno* factors, indicate that the issuance of the Retirement CD involves the business of insurance. The underlying principles of the business of insurance, as found in *Fabe, VALIC,* and *National Securities,* support the same conclusion.

3.

Having determined that the Retirement CD involves the business of insurance, we must determine whether the federal statute in question—here, the Bank Act—"specifically relates to the business of insurance" so as to overcome the reverse preemption provisions of McCarran-Ferguson. We conclude that the Bank Act does not specifically relate to the business of insurance.

We base this decision on the Supreme Court's reasoning in *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). There, the Court addressed the application of McCarran-Ferguson to section 13 of the Bank Act, which permits banks in towns of under 5000 population to offer insurance products to its customers. The pertinent language of section 13 is as follows:

> [A]ny such association located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census, may ... act as the agent for any fire, life, or other insurance company ... by soliciting and selling insurance and collecting premiums on policies issued by such company....

---

[14]Aside from attacking the assertion that the Retirement CD satisfies the first and third prongs of the *Pireno* test, Blackfeet also challenges generally the application of the test to this case. According to Blackfeet, terms such as "insurance policy" and "insured" suggest that the test was meant to examine only "ancillary conduct of an insurance company (not a federally chartered corporation)." While it may be that the Supreme Court has never examined non-insurance company activity under this test, we find no compelling reason why this test should not apply in the instant case. When determining what is the business of insurance, it is the *activity* with which we are concerned. Who conducts the activity should not affect the application of the test, but should only bear upon its third prong, if at all.

12 U.S.C. § 92.  The Court interpreted McCarran-Ferguson as a means "to protect state regulation primarily against *inadvertent* federal intrusion—say, through enactment of a federal statute that describes an affected activity in broad, general terms, of which the insurance business happens to comprise one part." *Barnett Bank,* 517 U.S. at 39, 116 S.Ct. at 1112.  Under that interpretation, the Court concluded that section 13 did in fact specifically relate to the business of insurance.  It based this conclusion on language in the statute, which included such terms as "insurance," "insurance company," "premiums," and "policies."  The Court stated:

> The language of the Federal Statute before us is not general.  It refers specifically to insurance.  Its state regulatory implications are not surprising, nor do we believe them inadvertent.  Consequently, considerations of purpose, as well as of language, indicate that [section 13] falls within the scope of the McCarran-Ferguson's "specifically relates" exception to its anti-pre-emption rule.

*Id.* at 41, 116 S.Ct. at 1112-13 (citation omitted).

In contrast to *Barnett Bank,* the statutory language in our case does not specifically relate to the business of insurance.  As stated earlier, the provisions of the Bank Act relied on by Blackfeet for authority to market the Retirement CD involve "a bank's express authority to accept deposits and enter into contracts, and authority to incur liabilities and fund its operations." *See* 12 U.S.C. § 24(Third), (Seventh).  Unlike section 13, section 24(Seventh) contains no specific reference to "insurance," or "premiums," or "policies," or any phrases generally associated with the business of insurance.  Nor does it direct or authorize banks to engage in activities normally engaged in by insurance companies.  Section 24(seventh) is a provision with broad, general terms, which Blackfeet wants to extend to cover the business of insurance.

This extension, however, is "exactly the intrusion the [*Barnett Bank* ] Court warned against:  [the provisions of the Bank Act] describe an affected activity (banking) in broad terms, of which the insurance business (the Retirement CD) is only a part." *Schacht,* 84 F.3d at 843.  We therefore agree with the *Schacht* court that section 24(Seventh) does not specifically relate to the business of insurance, and therefore the Bank Act is not saved from the reverse preemption of McCarran-Ferguson with regard to Florida insurance regulation of the Retirement CD.

17

IV.

The involvement of banks in the business of insurance has become a politically charged issue in recent times. There certainly is a trend developing towards deregulation in all areas of the financial services industry, and there is some indication that Congress will address regulation of banks offering insurance products in the near future. *See Insurance & Annuities: Dual Insurance Regulation Broached,* Bank Mutual Fund Report, No. 6, Feb. 9, 1998. We are required, however, to make our determination based on the law presently in force. Under that law, it is unreasonable for the Comptroller to conclude that issuing the Retirement CD is authorized as the business of banking by the Bank Act. Alternatively, assuming that the Retirement CD can appropriately be considered the business of banking, we nevertheless conclude that the Commissioner may regulate its issuance within the State of Florida. For the foregoing reasons, the judgment of the district court is AFFIRMED.