# BARNETT BANK OF MARION COUNTY, N. A. *v.* NELSON, FLORIDA INSURANCE COMMISSIONER, ET AL.

No. 94–1837.   Argued January 16, 1996—Decided March 26, 1996

Breyer, J., delivered the opinion for a unanimous Court.

*Nathan Lewin* argued the cause and filed briefs for petitioner. With him on the briefs were *Scott L. Nelson, James R. Heavner, Jr.,* and *Richard E. Swartley.*

*Richard P. Bress* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, Edward C. DuMont, Anthony J. Steinmeyer, Jacob M. Lewis, Julie L.*

*Williams, L. Robert Griffin, Ernest C. Barrett III*, and *Joan M. Bernott.*

*Daniel Y. Sumner* argued the cause and filed a brief for respondents Bill Nelson et al. With him on the brief were *David J. Busch, Dennis Silverman*, and *Karen Asher-Cohen. Ann M. Kappler* argued the cause and filed a brief for respondents Florida Association of Life Underwriters et al. With her on the brief were *Scott A. Sinder, Sam Hirsch, Bruce J. Ennis, Jr., Paul M. Smith*, and *Donald B. Verrilli, Jr.**

JUSTICE BREYER delivered the opinion of the Court.

The question in this case is whether a federal statute that permits national banks to sell insurance in small towns preempts a state statute that forbids them to do so. To answer this question, we must consider both ordinary pre-emption principles, and also a special federal anti-pre-emption rule, which provides that a federal statute will *not* pre-empt a

*Briefs of *amici curiae* urging reversal were filed for the American Bankers Association et al. by *John J. Gill III, Michael F. Crotty, Mathew H. Street, Richard M. Whiting, Leonard J. Rubin, M. Thurman Senn*, and *David L. Glass;* for American Deposit Corp. et al. by *Thaddeus Holt* and *Dennis M. Gingold;* for the Consumer Bankers Association et al. by *David W. Roderer, Eric L. Hirschhorn, Donn C. Meindertsma, John W. Anderson*, and *Jeffrey D. Quayle;* for the Florida Bankers Association by *J. Thomas Cardwell* and *Virginia B. Townes;* and for the New York Clearing House Association by *Bruce E. Clark, Michael M. Wiseman*, and *Norman R. Nelson.*

Briefs of *amici curiae* urging affirmance were filed for the American Council of Life Insurance by *David Overlock Stewart, James M. Lichtman, Gary E. Hughes*, and *Phillip E. Stano;* for the Council of Insurance Agents and Brokers by *Mark E. Herlihy;* for the National Association of Insurance Commissioners by *Ellen Dollase Wilcox;* for the National Conference of State Legislatures et al. by *Richard Ruda, Lee Fennell*, and *Arthur E. Wilmarth, Jr.;* and for Don W. Stephens et al. by *Stephen B. Cox, Suetta W. Dickinson, Julie A. Fuselier, Richard Blumenthal*, Attorney General of Connecticut, and *John G. Haines*, Assistant Attorney General.

state statute enacted "for the purpose of regulating the business of insurance"—*unless* the federal statute "*specifically relates to the business of insurance.*"  McCarran-Ferguson Act, 15 U. S. C. § 1012(b) (emphasis added).  We decide that the McCarran-Ferguson Act's special anti-pre-emption rule does not govern this case, because the federal statute in question "specifically relates to the business of insurance." We conclude that, under ordinary pre-emption principles, the federal statute pre-empts the state statute, thereby prohibiting application of the state statute to prevent a national bank from selling insurance in a small town.

## I

In 1916 Congress enacted a federal statute that says that certain national banks "may" sell insurance in small towns. It provides in relevant part:

> "In addition to the powers now vested by law in national [banks] organized under the laws of the United States *any such [bank]* located and doing business in any place [with a population] . . . [of not more than] five thousand . . . *may,* under such rules and regulations as may be prescribed by the Comptroller of the Currency, *act as the agent for any fire, life, or other insurance company* authorized by the authorities of the State . . . to do business [there], . . . by soliciting and selling insurance . . . Provided, however, That no such bank shall . . . guarantee the payment of any premium . . . And provided further, That the bank shall not guarantee the truth of any statement made by an assured [when applying] . . . for insurance."  Act of Sept. 7, 1916 (Federal Statute), 39 Stat. 753, as amended, 12 U. S. C. § 92 (emphases changed).

In 1974 Florida enacted a statute that prohibits certain banks from selling most kinds of insurance.  It says:

"No [Florida licensed] insurance agent . . . who is associated with, . . . owned or controlled by . . . a financial institution shall engage in insurance agency activities . . . ." Fla. Stat. § 626.988(2) (Supp. 1996) (State Statute).

The term "financial institution" includes

"any bank. . . . [except for a] bank which is not a subsidiary or affiliate of a bank holding company and is located in a city having a population of less than 5,000 . . . ." § 626.988(1)(a).

Thus, the State Statute says, in essence, that banks cannot sell insurance in Florida—except that an *unaffiliated* small town bank (*i. e.,* a bank that is not affiliated with a bank holding company) may sell insurance in a small town. *Ibid.*

In October 1993 petitioner Barnett Bank, an "affiliate[d]" national bank which does business through a branch in a small Florida town, bought a Florida licensed insurance agency. The Florida State Insurance Commissioner, pointing to the State Statute (and noting that the unaffiliated small town bank exception did not apply), ordered Barnett's insurance agency to stop selling the prohibited forms of insurance. Barnett, claiming that the Federal Statute pre-empted the State Statute, then filed this action for declaratory and injunctive relief in federal court.

The District Court held that the Federal Statute did not pre-empt the State Statute, but only because of the special insurance-related federal anti-pre-emption rule. The McCarran-Ferguson Act, which creates that rule, says:

"No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . ." McCarran-Ferguson Act, § 2(b), 59 Stat. 34, 15 U. S. C. § 1012(b).

The District Court decided both (1) that the Federal Statute did not fall within the McCarran-Ferguson Act's exception because it did not "specifically relat[e] to the business of insurance"; and (2) that the State Statute was a "law enacted . . . for the purpose of regulating the business of insurance." *Barnett Bank of Marion County, N. A.* v. *Gallagher*, 839 F. Supp. 835, 840–841, 843 (MD Fla. 1993) (internal quotation marks omitted). Consequently, the McCarran-Ferguson Act, in the District Court's view, instructs courts not to "constru[e]" the Federal Statute "to invalidate" the State Statute. 15 U. S. C. § 1012(b). The Eleventh Circuit Court of Appeals, for similar reasons, agreed that the Federal Statute did not pre-empt the State Statute. *Barnett Bank of Marion County, N. A.* v. *Gallagher*, 43 F. 3d 631, 634–637 (1995).

We granted certiorari due to uncertainty among lower courts about the pre-emptive effect of this Federal Statute. See *Owensboro Nat. Bank* v. *Stephens*, 44 F. 3d 388 (CA6 1994) (pre-emption of Kentucky statute that prevents national banks from selling insurance in small towns); *First Advantage Ins., Inc.* v. *Green*, 652 So. 2d 562 (La. Ct. App.), cert. and review denied, 654 So. 2d 331 (1995) (no pre-emption). We now reverse the Eleventh Circuit.

## II

We shall put the McCarran-Ferguson Act's special anti-pre-emption rule to the side for the moment, and begin by asking whether, in the absence of that rule, we should construe the Federal Statute to pre-empt the State Statute. This question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state, law. U. S. Const., Art. VI, cl. 2; see *California Fed. Sav. & Loan Assn.* v. *Guerra*, 479 U. S. 272, 280–281 (1987) (reviewing pre-emption doctrine).

Sometimes courts, when facing the pre-emption question, find language in the federal statute that reveals an explicit congressional intent to pre-empt state law. *E. g., Jones* v. *Rath Packing Co.,* 430 U. S. 519, 525, 530–531 (1977). More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the federal statute's "structure and purpose," or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent. *Id.,* at 525; *Fidelity Fed. Sav. & Loan Assn.* v. *De la Cuesta,* 458 U. S. 141, 152–153 (1982). A federal statute, for example, may create a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947). Alternatively, federal law may be in "irreconcilable conflict" with state law. *Rice* v. *Norman Williams Co.,* 458 U. S. 654, 659 (1982). Compliance with both statutes, for example, may be a "physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 142–143 (1963); or, the state law may "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941).

In this case we must ask whether or not the Federal and State Statutes are in "irreconcilable conflict." The two statutes do not impose directly conflicting duties on national banks—as they would, for example, if the federal law said, "you must sell insurance," while the state law said, "you may not." Nonetheless, the Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids. Thus, the State's prohibition of those activities would seem to "stan[d] as an obstacle to the accomplishment" of one of the Federal Statute's purposes—unless, of course, that federal purpose is to grant the bank only a very *limited* permission, that is, permission to sell insurance *to the extent that state law also grants permission to do so.*

That is what the State of Florida and its supporting *amici* argue. They say that the Federal Statute grants national banks a permission that is limited to circumstances where state law is not to the contrary. In their view, the Federal Statute removes only federal legal obstacles, not state legal obstacles, to the sale of insurance by national banks. But we do not find this, or the State's related, ordinary pre-emption arguments, convincing.

For one thing, the Federal Statute's language suggests a broad, not a limited, permission. That language says, without relevant qualification, that national banks "may . . . act as the agent" for insurance sales. 12 U. S. C. § 92. It specifically refers to "rules and regulations" that will govern such sales, while citing as their source not state law, but the federal Comptroller of the Currency. *Ibid.* It also specifically refers to state regulation, while limiting that reference to licensing—not of banks or insurance agents, but of the insurance companies whose policies the bank, as insurance agent, will sell. *Ibid.*

For another thing, the Federal Statute says that its grant of authority to sell insurance is in "addition to the *powers* now vested by law in national [banks]." *Ibid.* (emphasis added). In using the word "powers," the statute chooses a legal concept that, in the context of national bank legislation, has a history. That history is one of interpreting grants of both enumerated and incidental "powers" to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law. See, *e. g., First Nat. Bank of San Jose* v. *California*, 262 U. S. 366, 368–369 (1923) (national banks' "power" to receive deposits pre-empts contrary state escheat law); *Easton* v. *Iowa*, 188 U. S. 220, 229–230 (1903) (national banking system normally "independent, so far as powers conferred are concerned, of state legislation"); cf. *Waite* v. *Dowley*, 94 U. S. 527, 533 (1877) ("[W]here there exists a concurrent right of legislation in the States and in Congress, and the latter has exercised its

power, there remains in the States no authority to legislate on the same matter").

Thus, this Court, in a case quite similar to this one, held that a federal statute permitting, but not requiring, national banks to receive savings deposits pre-empts a state statute prohibiting certain state and national banks from using the word "savings" in their advertising. *Franklin Nat. Bank of Franklin Square* v. *New York*, 347 U. S. 373, 375–379 (1954) (Federal Reserve Act provision that national banks "may continue . . . to receive . . . savings deposits" read as "declaratory of the right of a national bank to enter into or remain in that type of business"). See also *De la Cuesta, supra*, at 154–159 (federal regulation permitting, but not requiring, national banks to include in mortgage contracts a debt accelerating "due on sale" clause pre-empts a state law forbidding the use of such a clause); cf. *Lawrence County* v. *Lead-Deadwood School Dist. No. 40–1*, 469 U. S. 256 (1985) (federal statute providing that local government units "may" expend federal funds for any governmental purpose pre-empts state law restricting their expenditure).

In defining the pre-emptive scope of statutes and regulations granting a power to national banks, these cases take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted. To say this is not to deprive States of the power to regulate national banks, where (unlike here) doing so does not prevent or significantly interfere with the national bank's exercise of its powers. See, *e. g.*, *Anderson Nat. Bank* v. *Luckett*, 321 U. S. 233, 247–252 (1944) (state statute administering abandoned deposit accounts did not "unlawful[ly] encroac[h] on the rights and privileges of national banks"); *McClellan* v. *Chipman*, 164 U. S. 347, 358 (1896) (application to national banks of state statute forbidding certain real estate transfers by insolvent transferees would not "destro[y] or hampe[r]" national banks' functions); *National Bank* v. *Commonwealth*, 9 Wall. 353, 362 (1870)

(national banks subject to state law that does not "interfere with, or impair [national banks'] efficiency in performing the functions by which they are designed to serve [the Federal] Government").

Nor do these cases control the interpretation of federal banking statutes that accompany a grant of an explicit power with an explicit statement that the exercise of that power is subject to state law. See, *e. g.*, 12 U. S. C. § 36(c) (McFadden Act) (authorizing national banks to operate branches, but only where state law authorizes state banks to do so); § 92a(a) (Comptroller of Currency may grant fiduciary powers "by special permit to national banks applying therefor, when not in contravention of State or local law"). Not surprisingly, this Court has interpreted those explicit provisions to mean what they say. See, *e. g.*, *First Nat. Bank in Plant City* v. *Dickinson*, 396 U. S. 122, 131 (1969) (under McFadden Act, state branching restrictions apply to national banks); *First Nat. Bank of Logan* v. *Walker Bank & Trust Co.*, 385 U. S. 252, 260–261 (1966) (same); see also *Van Allen* v. *Assessors*, 3 Wall. 573, 586 (1866) (enforcing 1864 amendments to National Bank Act expressly authorizing state taxation of national bank shares).

But, as we pointed out, *supra*, at 32–33, where Congress has not expressly conditioned the grant of "power" upon a grant of state permission, the Court has ordinarily found that no such condition applies. In *Franklin Nat. Bank,* the Court made this point explicit. It held that Congress did not intend to subject national banks' power to local restrictions, because the federal power-granting statute there in question contained "no indication that Congress [so] intended . . . as it has done *by express language* in several other instances." 347 U. S., at 378, and n. 7 (emphasis added) (collecting examples).

The Federal Statute before us, as in *Franklin Nat. Bank*, explicitly grants a national bank an authorization, permission, or power. And, as in *Franklin Nat. Bank*, it contains

no "indication" that Congress intended to subject that power to local restriction. Thus, the Court's discussion in *Franklin Nat. Bank*, the holding of that case, and the other precedent we have cited above, strongly argue for a similar interpretation here—a broad interpretation of the word "may" that does not condition federal permission upon that of the State.

Finally, Florida and its supporters challenge this interpretation by arguing that special circumstances surrounding the enactment of the Federal Statute nonetheless demonstrate Congress' intent to grant only a limited permission (subject to state approval). They point to a letter to Congress written by the Comptroller of the Currency in 1916. The Comptroller attached a draft of what became the Federal Statute, and the letter explains to Congress why the Comptroller wants Congress to enact his proposal. The letter says that, since 1900, many small town national banks had failed; that some States had authorized small town state banks to sell insurance; that providing small town national banks with authority to sell insurance would help them financially; and that doing so would also improve their competitive position vis-à-vis state banks. The relevant language in the letter (somewhat abridged) reads as follows:

> "[Since 1900, of 3,084 small national banks, 438] have either failed or gone into liquidation. . . .
> [T]here are many banks located in [small towns] . . . where the small deposits which the banks receive may make it somewhat difficult [to earn] . . . a satisfactory return . . . .
>
> "For some time I have been giving careful consideration to the question as to how the powers of these small national banks might be enlarged so as to provide them with additional sources of revenue and place them in a position where they could better compete with local State banks and trust companies which are sometimes

authorized under the law to do a class of business not strictly that of commercial banking. . . .

"[The federal banking laws, while granting national banks certain "incidental powers," do not give them] either expressly nor by necessary implication the power to act as agents for insurance companies. . . .

.        .        .        .        .

"My investigations lead me respectfully to recommend to Congress an amendment to the national-bank act by which national banks located in [small towns] . . . may be permitted to act as agents for insurance companies . . . .

"It seems desirable from the standpoint of public policy and banking efficiency that this authority should be limited to banks in small communities.  This additional income will strengthen them and increase their ability to make a fair return . . . .

"I think it would be unwise and therefore undesirable to confer this privilege generally upon banks in large cities where the legitimate business of banking affords ample scope for the energies of trained and expert bankers . . . .

"I inclose . . . a draft . . . designed to empower national banks located in [small] towns . . . under such regulations and restrictions as may from time to time be approved and promulgated by the Comptroller of the Currency, to act as agents for the placing of insurance policies . . . ." 53 Cong. Rec. 11001 (1916) (letter from Comptroller Williams to the Chairman of the Senate Bank and Currency Committee).

Assuming for argument's sake that this letter is relevant, and in response to the arguments of Florida and its supporters, we point out that the letter does not significantly advance their cause.  Although the letter mentions that enlarging the powers of small national banks will help them "better compete with local State banks," it primarily focuses upon small town national banks' need for added revenue—

an objective met by a broad insurance-selling authority that is not limited by state law. The letter refers to limitations that *federal* regulation might impose, but it says nothing about limitations imposed by *state* regulation or *state* law. The letter makes clear that authority to sell insurance in small towns is an added "incidental power" of a national bank—a term that, in light of this Court's then-existing cases, suggested freedom from conflicting state regulation. See *Easton*, 188 U. S., at 229–230; *First Nat. Bank of San Jose*, 262 U. S., at 368–369. The letter sets forth as potential objections to the proposal (or to its extension to larger national banks) concerns about distracting banking management or inhibiting the development of banking expertise—not concerns related to state regulatory control.

We have found nothing elsewhere in the Federal Statute's background or history that significantly supports the State's arguments. And as far as we are aware, the Comptroller's subsequent interpretation of the Federal Statute does not suggest that the statute provides only a limited authority subject to similar state approval. Cf. 12 CFR § 7.7100 (1995); OCC Interpretive Letter No. 366, CCH Fed. Banking L. Rep. ¶ 85,536, p. 77,833 (1986).

In light of these considerations, we conclude that the Federal Statute means to grant small town national banks authority to sell insurance, whether or not a State grants its own state banks or national banks similar approval. Were we to apply ordinary legal principles of pre-emption, the federal law would pre-empt that of the State.

### III

We now must decide whether ordinary legal principles of pre-emption, or the special McCarran-Ferguson Act anti-pre-emption rule, governs this case. The lower courts held that the McCarran-Ferguson Act's special anti-pre-emption rule applies, and instructs courts not to "construe" the Federal Statute to "invalidate, impair, or supersede" that of the

State. 15 U. S. C. § 1012(b). By its terms, however, the Act does not apply when the conflicting federal statute *"specifically relates to the business of insurance." Ibid.* (emphasis added). In our view, the Federal Statute in this case "specifically relates to the business of insurance"—therefore the McCarran-Ferguson Act's special anti-pre-emption rule does not apply.

Our conclusion rests upon the McCarran-Ferguson Act's language and purpose, taken together. Consider the language—"specifically relates to the business of insurance." In ordinary English, a statute that says that banks may act as insurance agents, and that the Comptroller of the Currency may regulate their insurance-related activities, *"relates"* to the insurance business. The word "relates" is highly general, and this Court has interpreted it broadly in other pre-emption contexts. See, *e. g., Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 47 (1987) (words " 'relate to' " have " 'broad common-sense meaning, such that a state law "relate[s] to" a benefit plan ". . . if it has a connection with or reference to such a plan" ' ") (quoting *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 739 (1985), in turn quoting *Shaw* v. *Delta Air Lines, Inc.,* 463 U. S. 85, 97 (1983)); *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374, 383–384 (1992) (interpreting similarly the words " 'relating to' " in the Airline Deregulation Act of 1978).

More importantly, in ordinary English, this statute *"specifically"* relates to the insurance business. "Specifically" can mean "explicitly, particularly, [or] definitely," Black's Law Dictionary 1398 (6th ed. 1990), thereby contrasting a *specific* reference with an *implicit* reference made by more general language to a broader topic. The general words "business activity," for example, will sometimes include, and thereby implicitly refer, to insurance; the particular words "finance, banking, and insurance" make that reference explicitly *and specifically.*

Finally, using ordinary English, one would say that this statute specifically relates to the *"business of insurance."* The statute explicitly grants national banks permission to "act as the agent for any fire, life, or other insurance company," to "solici[t] and sel[l] insurance," to "collec[t] premiums," and to "receive for services so rendered . . . fees or commissions," subject to Comptroller regulation. 12 U. S. C. § 92. It also sets forth certain specific rules prohibiting banks from guaranteeing the "payment of any premium on insurance policies issued through its agency . . ." and the "truth of any statement made by an assured in filing his application for insurance." *Ibid.* The statute thereby not only focuses directly upon industry-specific selling practices, but also affects the relation of insured to insurer and the spreading of risk—matters that this Court, in other contexts, has placed at the core of the McCarran-Ferguson Act's concern. See *Union Labor Life Ins. Co.* v. *Pireno,* 458 U. S. 119, 129 (1982) (citing *Group Life & Health Ins. Co.* v. *Royal Drug Co.,* 440 U. S. 205 (1979); see also *Department of Treasury* v. *Fabe,* 508 U. S. 491, 502–504 (1993).

Consider, too, the McCarran-Ferguson Act's basic purposes. The Act sets forth two mutually reinforcing purposes in its first section, namely, that "continued regulation and taxation by the several States of the business of insurance is in the public interest," and that *"silence* on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U. S. C. § 1011 (emphasis added). The latter phrase, particularly the word "silence," indicates that the Act does not seek to insulate state insurance regulation from the reach of all federal law. Rather, it seeks to protect state regulation primarily against *inadvertent* federal intrusion—say, through enactment of a federal statute that describes an affected activity in broad, general terms, of which the insurance business happens to constitute one part.

40

The circumstances surrounding enactment of the McCarran-Ferguson Act suggest the same. Just prior to the law's enactment, this Court, in *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944), held that a federal antitrust law, the Sherman Act, applied to the business of insurance. The Sherman Act's highly general language said nothing specifically about insurance. See 15 U. S. C. § 1 (forbidding every "contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States"). The Sherman Act applied only to activities in or affecting interstate commerce. *Hopkins* v. *United States*, 171 U. S. 578, 586 (1898). Many lawyers and insurance professionals had previously thought (relying, in part, on this Court's opinion in *Paul* v. *Virginia*, 8 Wall. 168, 183 (1869), and other cases) that the issuance of an insurance policy was not a "transaction of commerce," and therefore fell outside the Sherman Act's scope. *South-Eastern Underwriters* told those professionals that they were wrong about interstate commerce, and that the Sherman Act did apply. And *South-Eastern Underwriters'* principle meant, consequently, that other generally phrased congressional statutes might also apply to the issuance of insurance policies, thereby interfering with state regulation of insurance in similarly unanticipated ways.

In reaction to *South-Eastern Underwriters*, Congress "moved quickly," enacting the McCarran-Ferguson Act "to restore the supremacy of the States in the realm of insurance regulation." *Fabe, supra,* at 500. But the circumstances we have just described mean that *"restor[ation]"* of "supremacy" basically required setting aside the unanticipated effects of *South-Eastern Underwriters*, and cautiously avoiding similar unanticipated interference with state regulation in the future. It did not require avoiding federal preemption by future federal statutes that indicate, through their "specific relat[ion]" to insurance, that Congress had focused upon the insurance industry, and therefore, in all

likelihood, consciously intended to exert upon the insurance industry whatever pre-emptive force accompanied its law. See also, *e. g.,* insofar as relevant, 91 Cong. Rec. 483 (1945) (statement of Sen. O'Mahoney, floor manager of the Act, that the Act was intended to be "a sort of catch-all provision to take into consideration other acts of Congress which might affect the insurance industry, but of which we did not have knowledge at the time"); *ibid.* (similar statement of Sen. Ferguson).

The language of the Federal Statute before us is not general. It refers specifically to insurance. Its state regulatory implications are not surprising, nor do we believe them inadvertent. See Part II, *supra.* Consequently, considerations of purpose, as well as of language, indicate that the Federal Statute falls within the scope of the McCarran-Ferguson Act's "specifically relates" exception to its anti-pre-emption rule. Cf. *John Hancock Mut. Life Ins. Co.* v. *Harris Trust and Sav. Bank,* 510 U. S. 86, 98 (1993) (adopting the United States' view that language in the Employee Retirement Income Security Act of 1974 defining a "guaranteed benefit policy" as a certain kind of "insurance" policy "obviously and specifically relates to the business of insurance") (internal quotation marks omitted).

We shall mention briefly why we are not convinced by several of the parties' remaining arguments. Florida says that the Federal Statute "specifically relates" to banking, not to insurance. But a statute may specifically relate to more than one thing. Just as an ordinance forbidding dogs in city parks specifically relates to dogs and to parks, so a statute permitting banks to sell insurance can specifically relate to banks and to insurance. Neither the McCarran-Ferguson Act's language, nor its purpose, requires the Federal Statute to relate *predominantly* to insurance. To the contrary, specific detailed references to the insurance industry in proposed legislation normally will achieve the McCarran-Ferguson Act's objectives, for they will call the proposed leg-

islation to the attention of interested parties, and thereby normally guarantee, should the proposal become law, that Congress will have focused upon its insurance-related effects.

An *amicus* argues that our interpretation would give the Act "little meaning," because "whenever a state statute 'regulates' the business of insurance, any conflicting federal statute necessarily will 'specifically relate' to the insurance business." Brief for American Council of Life Insurance as *Amicus Curiae* 4. We disagree. Many federal statutes with potentially pre-emptive effect, such as the bankruptcy statutes, use general language that does not appear to "specifically relate" to insurance; and where those statutes conflict with state law that was enacted "for the purpose of regulating the business of insurance," the McCarran-Ferguson Act's anti-pre-emption rule will apply. See generally *Fabe, supra,* at 501 (noting the parties' agreement that federal bankruptcy priority rules, although conflicting with state law, do not "specifically relate" to the business of insurance).

The lower courts argued that the Federal Statute's 1916 date of enactment was significant, because Congress would have then believed that state insurance regulation was beyond its "Commerce Clause" power to affect. The lower courts apparently thought that Congress therefore could not have intended the Federal Statute to pre-empt contrary state law. The short answer to this claim is that there is no reason to think that Congress believed state insurance regulation beyond its constitutional powers to affect—insofar as Congress exercised those powers to create, to empower, or to regulate national banks. See *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819); *Farmers' and Mechanics' Nat. Bank* v. *Dearing,* 91 U. S. 29, 33 (1875); see also, *e. g., Easton* v. *Iowa,* 188 U. S., at 238. We have explained, see Part II, *supra,* why we conclude that Congress indeed *did* intend the Federal Statute to pre-empt conflicting state law.

Finally, Florida points to language in *Fabe*, which states that the McCarran-Ferguson Act "imposes what is, in effect, a clear-statement rule" that forbids pre-emption "unless a federal statute specifically requires otherwise." 508 U. S., at 507. Florida believes that this statement in *Fabe* means that the Federal Statute would have to use the words "state law is pre-empted," or the like, in order to fall within the McCarran-Ferguson Act exception. We do not believe, however, that *Fabe* imposes any such requirement. Rather, the quoted language in *Fabe* was a general description of the Act's effect. It simply pointed to the existence of the clause at issue here—the exception for federal statutes that "specifically relat[e] to the business of insurance." But it did not purport authoritatively to interpret the "specifically relates" clause. That matter was not at issue in *Fabe*. We therefore believe that *Fabe* does not require us to reach a different result here.

For these reasons, the judgment of the Court of Appeals is reversed.

*It is so ordered.*