**Arthur Jack ROSS, et al.**

v.

**BROADWAY TOWERS, INC.**

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

Nov. 7, 2006 Session.

Dec. 14, 2006.

Order on Petition to Rehear Jan. 5, 2007.

Permission to Appeal Denied by
Supreme Court June 25, 2007.

Kendra J. Mansur, Knoxville, Tennessee, for the Appellants, Arthur Jack Ross and Barbara Wheeler Ross.

Donald K. Vowell, Knoxville, Tennessee, for the Appellee Broadway Towers, Inc.

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

## OPINION

Broadway Towers, Inc. ("Broadway Towers") provides federally subsidized housing for the elderly and disabled. Applicable federal regulations permit Broadway Towers to conduct criminal background checks on applicants and their family members or caretakers who will be residing with the applicant at the facility. Mr. Jack Ross applied for residency at Broadway Towers and also sought permission for his live-in aid, Ms. Barbara Wheeler, to reside on the premises with him. Ms. Wheeler signed an authorization for Broadway Towers to conduct a criminal background check using the name "Barbara M. Wheeler." Both Mr. Ross and Ms. Wheeler were approved to live on the premises. Broadway Towers later discovered that Ms. Wheeler had a felony forgery conviction under the name "Barbara M. Norwood." The felony forgery conviction resulted from Ms. Wheeler's attempt to obtain money illegally from her elderly mother's bank account by using forged legal documents. Upon learning of Ms. Wheeler's felony forgery conviction, Broadway Towers served a notice of noncompliance on Mr. Ross requiring him and Ms. Wheeler to vacate the premises.

When Mr. Ross and Ms. Wheeler refused to vacate the premises, this lawsuit was filed. The Trial Court ordered Mr. Ross and Ms. Wheeler to vacate the premises. We affirm.

### *Background*

Pursuant to a contract with the federal Department of Housing and Urban Development ("HUD") and in accordance with Section 202 of the federal Housing Act of 1959, as amended, Broadway Towers provides subsidized housing to the elderly and disabled. Mr. Jack Ross is currently eighty-five years old, and for several years has had numerous health issues which require a live-in aid to help care for his daily needs. In November of 2004, Mr. Ross and Broadway Towers entered into a document titled "202 ELDERLY/HANDICAPPED LEASE" (the "Lease"). Pursuant to the Lease, Mr. Ross' monthly rent payment totaled $475, with Mr. Ross paying $259 and HUD paying the remaining $216. The Lease provided that pursuant to HUD regulations, Broadway Towers could terminate the Lease "based upon either material noncompliance with this Agreement, material failure to carry out obligations under any State landlord or tenant act, or other good cause." After setting forth the procedure to be utilized in the event of termination by either party, the Lease goes on to provide that Broadway Towers could terminate the lease for eight specific reasons. The provision pertinent to this appeal provides that the Lease can be terminated for:

(4) Criminal activity by a tenant, any member of the tenant's household, a guest or another person under the tenant's control:

(a) That threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises); or

(b) That threatens the heath, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises.

In addition to the contents of the Lease, Mr. Ross acknowledged that he received and was explained the contents of a document which set forth the rules and regulations of the property. Among other things, this document provides that:

A resident will be held directly responsible for the actions of their household members, family members, caretakers/attendants, guest and/or visitors . . . . Resident acknowledges and agrees to inform and explain all Rules and Regulations to family members, caretakers/attendants, guest and/or visitors.

When he entered into the Lease, Mr. Ross was being provided living assistance by Ms. Barbara Wheeler, who is currently sixty-one (61) years old. Mr. Ross sought approval from Broadway Towers for Ms. Wheeler to continue to provide this assistance and live on the premises with Mr. Ross. Ms. Wheeler signed an authorization for Broadway Towers to conduct a criminal records background check. Ms. Wheeler signed her full name as: Barbara (Bobbie) Maurine Wheeler. A criminal records check was conducted using the name "Barbara M. Wheeler" which showed no felony convictions or other criminal activity under that name.

The manager of Broadway Towers, Ms. Barbara Everence, described the following event which happened approximately five and one-half months after Mr. Ross and Ms. Wheeler moved into Broadway Towers:

Mr. Ross appeared to be confused when he was in the common areas of the apartment complex. Several different residents made a comment of that, that

Mrs. Wheeler was in jail and wasn't taking care of him.

Broadway Towers then contacted the Sheriff's Department and learned that Ms. Wheeler indeed was in jail. Upon further inquiry, Broadway Towers learned that Ms. Wheeler had a criminal record under the name "Barbara Norwood." Among other things, Ms. Wheeler had pled guilty to a Class E felony after she forged a document in an attempt to withdraw money from her elderly mother's bank account. Ms. Wheeler's illegal attempt to withdraw money from her mother's bank account took place on June 30, 2000, and the Affidavit of Complaint provided by Ms. Wheeler's mother provides as follows:

> The Defendant committed the offense of Forgery ... on or about Friday June 30, 2000. The above named Defendant did attempt to obtain cash by means of transferring a forged document in the form of a Power of Attorney. The amount in the account was $30,000. The Defendant attempted to withdraw money from her mother's account by presenting a forged power of attorney where she had forged her mother's signature. The Defendant then filled out a Joint Survivorship Agreement and also forged the Affiant's name to it. The Defendant then tried to remove her mother's money from her account. This did happen at ... [the] Rohm–Haas Credit Union in Knoxville .... The witness ... knew Defendant and called Affiant to check on Power of Attorney and was informed by Affiant that she did not sign Power of Attorney and did not give permission for Defendant to get money from her acct.

Ms. Wheeler was indicted on four felony counts of forgery. On February 9, 2004, Ms. Wheeler pled guilty to one Class E felony count of forgery. Ms. Wheeler was sentenced to two years in the Tennessee Department of Corrections. However, it was agreed that Ms. Wheeler's two year sentence would be suspended upon her payment of court costs and her being placed on probation until January 23, 2011. Ms. Wheeler was declared "infamous" and ordered to provide a biological sample for DNA analysis.

Broadway Towers obtained an accurate copy of Ms. Wheeler's criminal history on April 28, 2005.

Mr. Ross and Ms. Wheeler were married on May 5, 2005.[1]

Upon learning of Ms. Wheeler's criminal background, Broadway Towers issued Mr. Ross a thirty day notice of material non-compliance (the "Notice"). Mr. Ross was informed that his lease would be terminated effective June 9, 2005, for a material non-compliance with the Lease. The Notice provided that the Lease was being terminated because of "[c]riminal activity by a tenant, any member of the tenant's household, a guest or another person under the tenant's control." The Notice also referenced the rules and regulations which provided that a "resident will be held directly responsible for the actions of their household members, family members, caretakers/attendants, guests and/or visitors." The Notice also stated:

> You are hereby notified that you are now in default of your lease due to the following actions(s):
>
> Your live-in aide/wife has a felony conviction which prohibits her from residing at Broadway Towers Apartments due to our one-strike policy which you signed upon moving in to our facility.

---

1. For the sake of consistency, we will continue to refer to Mr. Ross' now wife as Ms. Wheeler, as opposed to Mrs. Ross.

Although Mr. Ross was informed that his lease would terminate on June 9, 2005, he submitted a rent payment on June 3, 2005. As Mr. Ross explained, "I just put it in the slot and they took it." After Mr. Ross and Ms. Wheeler refused to vacate the premises, Broadway Towers filed a detainer warrant in the Knox County General Sessions Court. The Sessions Court entered a judgment for possession in favor of Broadway Towers. Mr. Ross then filed a Petition for Writ of Certiorari and Supersedeas in the Circuit Court. Following a trial, the Circuit Court issued a Memorandum Opinion stating, in relevant part, as follows:

In this case, very briefly, it appears that Mr. Ross applied for an apartment at Broadway Towers ... and ultimately learned on or about November the 2nd, 2004 that an apartment was available. And as a consequence, a lease was made with Mr. Ross for the use and possession of the apartment premises at Broadway Towers.

At that time, Mr. Ross certified with the appropriate medical evidence that he had the need of a live-in aid and requested then Barbara Wheeler, or Barbara Wheeler Norwood as the case may be, be permitted to live with him as his live-in aid, and that request was granted. At or about that time, Broadway Towers, following its regular practice, attempted to secure information about any criminal history that Barbara Wheeler might then have. There was considerable delay in obtaining information about Ms. Wheeler's criminal history.

But ultimately, on or about April 28th, 2005, Broadway Towers received information from the Criminal Court Clerk's office of this county indicating that Ms. Wheeler had what one might consider, a rather considerable criminal history or criminal record. The records furnished to Broadway Towers indicated that she had been convicted of disorderly conduct on November 21st of 2000 and that she had been charged on or about November the 16th, 2004 with two counts of assault, which had been bound over to the grand jury and which cases apparently are still pending.

Moreover, those records indicated that on February the 9th, 2004, she [was] convicted by the Criminal Court of this county for forgery. The underlying records indicated that she had apparently attempted to obtain $30,000 or thereabouts from a credit union that belonged to her mother, and her attempt to secure those funds was by the device of forgery.

The records further indicated that on March the 11th, 2005, the probation that had been granted to her in connection with her conviction of forgery was revoked. And so as a result of this history, and in its attempt to screen applicants as it is entitled to do for occupancy at Broadway Towers, the Broadway Towers became somewhat concerned. And on May the 9th of 2005, Broadway Towers issued a notice to Mr. Ross that because of the forgery conviction, a felony of Mrs. Wheeler, he would be required to terminate his lease arrangement with that apartment complex on June the 9th of 2005 ....

The notice that Broadway Towers gave to Mr. Ross to terminate his tenancy referred to only one part of Mrs. Ross' criminal history. It stated that Mr. Ross was notified that he was in default under his lease, due to "your live in maid/wife has a felony conviction which prohibits her from residing at Broadway Towers due to our one strike policy which you signed upon moving in to our facility."

The defendants have taken issue with the adequacy of that notice. And certainly a question is raised about whether the Broadway Towers Incorporated is entitled to rely on other parts of the criminal history of Mrs. Ross when that criminal history was not specified in the notice given to Mr. Ross to terminate.

However, the Court notes that under the regulations that apply to these subsidized housing cases the landlord is only required to state the reasons for termination with "enough specificity so as to enable the tenant to prepare a defense [to] the grounds for termination." And in any event, it would appear that the defendants were clearly advised that Broadway Towers was at least concerned in this case about Mrs. Ross' conviction for forgery.

It appears to the Court and the Court finds in these cases that operators of subsidized housing projects of this kind in this case are entitled to screen applicants, and as a matter of fact, they are required to place in their lease terms and certain provisions that enable the owner or manager of the subsidized housing property to terminate lease agreements with tenants that have been engaged in criminal activity that would threaten the safety or health of other tenants, or the peaceful enjoyment of the premises by other tenants. And it would appear in this case that most probably, if Mrs. Ross had disclosed the fact that she had gone by the name of Norwood, that her criminal record would have been made evident to Broadway Towers earlier and she would not have been permitted to occupy the premises in the first place . . . .

[T]he Plaintiff, Broadway Towers, is entitled to screen applicants. And so the character of the people that they admit for occupancy is a pertinent consideration under the federal regulations that apply to these kinds of cases. There's no question that Mrs. Ross was guilty of the offense of forgery, and there's no question that her probation was revoked by the Court with respect to that conviction on March the 11th, 2005.

The Court perhaps should add that the federal regulations provide that these agreements in these cases must also contain a provision that the lease can be terminated if a tenant or others affected by the lease have had probation revoked or are fleeing in an attempt to avoid sanctions of the criminal court.

So there are ample grounds here to terminate this lease. And it would appear to the Court that it is a fair inference that Mrs. Ross' conviction and her criminal history threatened the safety or health or peaceful enjoyment of the premises by other tenants in the sense that these elderly people living there would no doubt be concerned if they learned that someone occupying the premises with them had been guilty of this kind of theft crime. And I submit that it would not make any difference to those tenants whether that crime occurred during the lease or before the lease . . . .

In any event, I find in this case that Broadway Towers, Incorporated has established that they had a right to terminate the lease, and that the notice was appropriate. And in this case, I find that the regulations which permit termination under these circumstances are for the benefit of all occupants of the subsidized housing project; and that the landlord has a duty to enforce those regulations and enforce those lease provisions for the benefit of other tenants; and that they are not entitled to waive the right of other tenants to insist upon the enforcement of those regulations.

And hence, I conclude that the acceptance of rent for the month of June 2005 allegedly, inadvertently, by Broadway Towers in this case was not a waiver as contemplated by the Tennessee Residential Landlord and Tenant Act.

The Trial Court then entered a final judgment giving Mr. Ross and Ms. Wheeler until January 1, 2006 in which to vacate the premises. It was also ordered that Mr. Ross was to pay rent through that date.

Mr. Ross appeals, raising the following issues, which we quote:

I. Whether the Trial Court erred in granting the detainer warrant when federal regulations require Broadway Towers to evict only for the reasons listed on the termination notice, and the act of forgery committed by Mrs. Wheeler Ross more than five years ago does not constitute criminal activity for which the complex can evict.

II. Whether the Trial Court erred in granting the detainer warrant when Broadway Towers had signed a lease with Mr. Ross, and there were no allegations in the lease termination notice of any breaches of the lease by either Mr. Ross or Mrs. Wheeler Ross that occurred during the lease term.

III. Whether the Trial Court erred in granting the detainer warrant when Broadway Towers accepted rent without reservation in June 2005, after giving Mr. Ross a lease termination notice on May 9, 2005.

### *Discussion*

■ The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn.

R.App. P. 13(d); *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn.2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.,* 58 S.W.3d 706, 710 (Tenn.2001).

In many respects, the relevant portions of the lease mirror the pertinent federal regulations. For example, the federal regulations provide that a lease "must" provide for termination of the lease for the following:

(1) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises); or

(2) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises.

24 C.F.R. § 5.859(a).

The federal regulations also provide that the property owner cannot terminate a lease except for several specifically listed causes, one of which is "[c]riminal activity by a covered person in accordance with" section 5.859. 24 C.F.R. § 880.607(b)(iii). The regulations go on to provide that while the property owner need only state the reasons for termination of the lease with "enough specificity so as to enable the tenant to prepare a defense," 24 C.F.R. § 247.4(a)(2), the owner "may not rely on any grounds which are different from the reasons set forth in the notice." 24 C.F.R. § 880.607(c)(3).

Mr. Ross' first issue is twofold. Mr. Ross initially claims that Broadway Towers can evict only for the reasons listed on the termination notice and, because only

Ms. Wheeler's felony conviction is listed on the notice, the Trial Court improperly considered Ms. Wheeler's other alleged criminal activity. Next, Mr. Ross claims that Ms. Wheeler's forgery conviction for conduct which occurred more than five years ago does not constitute criminal activity for which Broadway Towers can evict. We will discuss these two issues in reverse order.

■ Broadway Towers is a subsidized housing facility for elderly and disabled residents. If Ms. Wheeler will forge legal documents in an attempt to steal a substantial amount of money from her own elderly mother, then the other elderly and/or disabled residents of the premises cannot be excluded as potential future victims of Ms. Wheeler. Due to the nature of Ms. Wheeler's forgery conviction, there is no question but that she has engaged in criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents, which also unfortunately includes Mr. Ross.

The fact that the forgery took place roughly five years ago does not minimize the existence of the clear threat posed by Ms. Wheeler. The regulations authorized Broadway Towers to obtain the criminal history of Ms. Wheeler. *See* 24 C.F.R. § 5.855. These regulations do not provide any time limitation as to how far back the property owner may go when requesting a criminal history. We note, however, that the property owner "may establish a period before the admission decision during which an applicant must not have engaged" in the criminal activity that would threaten the health or safety of the other residents. 24 C.F.R. § 5.855(b). The criminal records authorization signed by Ms. Wheeler is unclear on how far back Broadway Towers goes when conducting a

criminal records check. The reason for this is because the authorization states it will go back "three (5) years." Although it is unclear whether the records check will go back "three" or "(5)" years, the result in this case is the same because Ms. Wheeler actually was convicted of the forgery only nine months before she signed the authorization. We conclude that Ms. Wheeler's felony forgery committed more than five years ago but for which Ms. Wheeler was convicted less than one and one-half years before the Notice was given and only nine months before she signed the criminal history authorization does indeed constitute criminal activity for which Broadway Towers could evict.

The next issue is whether the Trial Court improperly considered Ms. Wheeler's other criminal activity. Mr. Ross was notified that the Lease was being terminated because of Ms. Wheeler's criminal activity, specifically the "felony conviction which prohibits her from residing at Broadway Towers Apartments due to our one-strike policy which you signed upon moving in to our facility." When Broadway Towers obtained an accurate copy of Ms. Wheeler's criminal history, it discovered that Ms. Wheeler's criminal past involved more than the felony conviction. Again, we note that the federal regulations provide that the property owner "may not rely on any grounds which are different from the reasons set forth in the notice." 24 C.F.R. § 880.607(c)(3). Based on the clear language of the regulations, we believe the Trial Court should not have relied on anything in Ms. Wheeler's past other than the felony conviction. In its memorandum opinion, the Trial Court certainly mentioned Ms. Wheeler's other criminal activity, some of which still was pending in the criminal court system at that time.[2]

---

**2.** While this appeal was pending, Ms. Wheeler     filed a motion to consider post-judgment facts

What is not clear is whether the Trial Court actually relied on anything other than the felony conviction when ultimately concluding that Broadway Towers had sufficient grounds to terminate the Lease. We vacate that portion of the Trial Court's judgment which discusses any aspect of Ms. Wheeler's criminal history other than her felony conviction. However, we affirm the ultimate determination made by the Trial Court because, as found by the Trial Court, "the defendants were clearly advised that Broadway Towers was at least concerned in this case about Mrs. Ross' conviction for forgery," and the felony conviction, standing alone, is more than sufficient for Broadway Towers to terminate the Lease. A fair reading of the Trial Court's Memorandum Opinion shows Mrs. Wheeler's felony conviction certainly formed the primary and quite possibly the exclusive basis for the Trial Court's determination.

Mr. Ross' next issue is his claim that the Trial Court erred in granting the detainer warrant when the termination notice contained no allegation of any breach by either Mr. Ross or Ms. Wheeler that occurred during the term of the Lease. We disagree. The federal regulations set forth above clearly entitle Broadway Towers to screen applicants and deny an application based on certain criminal conduct. In the Trial Court's memorandum opinion, the Trial Court correctly noted that had Ms. Wheeler "disclosed the fact that she had gone by the name of Norwood, [then] her criminal record would have been made evident to Broadway Towers earlier and she would not have been permitted to occupy the premises in the first place." The record fully supports this finding. Ms. Wheeler should not be permitted to escape

the consequences of her misconduct simply because she gave a different name when providing her name for purposes of Broadway Towers conducting a criminal records check. If Ms. Wheeler had provided the name "Barbara Norwood," then she never would have been allowed to live in Broadway Towers in the first place. Therefore, it matters not that Mr. Ross and Ms. Wheeler did not engage in any conduct during the term of the Lease that would be considered in violation of that Lease. As found by the Trial Court and as supported by the record, the regulations involved in this case are for the benefit not only of Mr. Ross but also for all the other occupants of the subsidized housing project. To accept the Ross' position means that if a prospective tenant who clearly would not have been accepted to live in the subsidized housing project if her true criminal history was known manages to slip through, for whatever reason, then that tenant must be allowed to remain and all the other occupants of the subsidized housing project just have to accept the additional risk from her being allowed to continue living on the premises. Such a holding would be contrary to the intent of the regulations to protect all the occupants of the subsidized housing project.

■ The final issue is Mr. Ross' claim that because Broadway Towers accepted Mr. Ross' June 2005 rent payment without any reservation of rights, Broadway Towers has effectively condoned the alleged default and is estopped from terminating the Lease. Mr. Ross relies on Tenn.Code Ann. § 66–28–508 which is part of Tennessee's Uniform Residential Landlord and Tenant Act and which states:

> If the landlord accepts rent without reservation and with knowledge of a tenant

which contained certified documents showing the assault charges brought against Ms. Wheeler had been dismissed. Due to our

resolution of the various issues, this issue is moot.

default, the landlord by such acceptance condones the default and thereby waives such landlord's right and is estopped from terminating the rental agreement as to that breach.

At the outset, we note that at least some rent would have been due through the 9th of June, even if the Lease was terminated and Mr. Ross moved from the premises on that date. Therefore, Broadway Towers would have been entitled to keep at least a portion of this rent payment. When rejecting Mr. Ross' argument on this issue, the Trial Court essentially determined that Broadway Towers had a "duty to enforce [the federal] regulations and enforce those lease provisions for the benefit of other tenants; and that they are not entitled to waive the right of other tenants to insist upon the enforcement of those regulations." In short, the Trial Court determined that the policies behind the federal regulations trumped the Landlord and Tenant Act in this regard. We agree.

In *Scarborough v. Winn Residential L.L.P./Atlantic Terrace Apartments,* 890 A.2d 249 (D.C.Ct.App.2006), the District of Columbia Court of Appeals was confronted with the application of a provision in the District of Columbia Code which required landlords to give tenants a thirty day notice to correct a violation before the tenant could be evicted. The Court of Appeals needed to decide if the provision in the D.C.Code took precedence over HUD regulations, or vice versa. The landlord in *Scarborough* was attempting to evict a tenant because of the tenant's possession of an unregistered firearm. The landlord claimed the tenant's possession of the firearm endangered the health and safety of the residents in the subsidized housing facility. *Id.* at 252. The tenant claimed she could not be evicted because the landlord failed to comply with a D.C. Code provision which required a thirty day no-

tice to correct the violation. The D.C. Court of Appeals stated:

Strictly speaking, the issue is not one of federal pre-emption of state action, but whether, "[i]n matters of the present sort, a congressional statute [and regulations] of national application prevail[ ] over a statute applying only to the District of Columbia." *In re Estate of Couse,* 850 A.2d 304, 305 n. 1 (D.C.2004), quoting *District of Columbia v. Wolverton,* 112 U.S.App. D.C. 23, 24 n. 3, 298 F.2d 684, 685 n. 3 (1961). But, as no difference of substance has been suggested between that question and the issue of federal pre-emption, we apply the latter doctrine.

Courts have identified three ways in which a federal statute can pre-empt state law: by express pre-emption, where statutory language "reveals an explicit congressional intent to pre-empt state law," *Barnett Bank of Marion County v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996); by field pre-emption, in which "federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it,'" *Cipollone [ v. Liggett Group, Inc.],* 505 U.S. [504,] 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 [ (1992) ] (citation and quotation marks omitted); and by implied or conflict pre-emption, which applies " 'where compliance with both federal and state regulations is a physical impossibility, ... or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objecti[ves] of Congress.' " *Boggs v. Boggs,* 520 U.S. 833, 844, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (citations omitted) ....

The parties agree that this case does not involve express or field pre-emption, nor is compliance with both D.C.Code

§ 42–3505.01(b) and federal law a "physical impossibility." The question, rather, is whether application of the District's cure opportunity for criminal violations that threaten the safety or peace of other tenants would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." It is clear to us that it would.

Among the many conditions imposed by the Mod Rehab program (and by HUD's other housing assistance programs) are that specific provisions must appear in the written lease agreements with individual tenants. As relevant here, 42 U.S.C. § 1437f(d)(1)(B) states:

> Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that—
>
> * * *
>
> (iii) during the term of the lease, *any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants* ... engaged in by a tenant of any unit ... or any guest or other person under the tenant's control, *"shall be cause for termination of tenancy."* [Emphasis added.]

In enacting this provision, as in enacting a parallel provision for public housing, *see* 42 U.S.C. § 1437d(*l*)(6), Congress declared that "the Federal Government has a duty to provide public and other federally assisted low-income housing that is decent, safe, and free from illegal drugs." 42 U.S.C. § 11901(1) (emphasis added).

* * *

Applying the cure provision of D.C.Code § 42–3505.01(b) would stand as a pronounced obstacle to the exercise of this authority. Not for nothing are lease provisions of the kind involved here described as manifesting a federal "One–Strike Policy." The only way to make sense of the idea of "correct[ing]" criminal activity would be to require the tenant not to engage in such activity again. But, as HUD points out in the government's brief *amicus curiae,* "this interpretation quickly renders the eviction provision a virtual nullity, because the grounds for eviction-the criminal act-would be washed away by a simple promise not to commit another crime." The very ease of thwarting the landlord's right to evict for commission of such a crime would frustrate the purpose of an anticrime provision that permits eviction for "any" criminal activity threatening in the sense defined.

It is true ... that termination of a tenancy after criminal activity is not automatic under federal law; housing providers have discretion whether to exercise the right of eviction. *See Rucker,* 535 U.S. at 133–34, 122 S.Ct. 1230, 152 L.Ed.2d 258. But the cure opportunity provided by § 42–3505.01(b), if applicable to violations of "an obligation of tenancy" dangerously criminal in nature, would substitute for the landlord's discretion a mandatory second-strike opportunity for a tenant to stay eviction by discontinuing, or not repeating, the criminal act during the thirty days following notice. We do not believe Congress meant to permit that obligatory re-setting of the notice clock ....

*Scarborough,* 890 A.2d at 255–57.

We agree with the rationale in *Scarborough.* Even assuming, without deciding, that Broadway Towers can be said to have accepted the rent without reserving its rights and with full knowledge of the de-

fault[3], we think Tenn.Code Ann. § 66–28–508 has no application *to this case* given the facts of this case. Specifically, we believe the federal public policy in providing subsidized housing that is safe and crime-free for all the tenants is paramount to any policy at issue in Tenn.Code Ann. § 66–28–508. In light of the facts presented in this case, we conclude that even if the provisions of Tenn.Code Ann. § 66–28–508 were triggered, application of that statute is preempted by the federal regulations because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Scarborough,* 890 A.2d at 255 (quoting *Boggs v. Boggs,* 520 U.S. 833, 844, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997)). Accordingly, the Trial Court correctly determined that Broadway Towers' acceptance of the June 2005 rent check cannot be held as a waiver to its enforcement of the Lease provisions for the benefit of all the other tenants residing at that complex.

In conclusion, we affirm the Trial Court's judgment awarding possession of the apartment to Broadway Towers. Mr. Ross and Ms. Wheeler will have thirty days after the mandate is issued in this case in which to vacate the premises. In the meantime, Mr. Ross is to pay rent in accordance with the terms of the Lease.

### *Conclusion*

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are taxed to the Appellants, Arthur Jack Ross and Barbara Wheeler Ross, and their surety, if any.

---

**3.** We note that the Trial Court found that Broadway Towers inadvertently accepted the rent check when it was placed through the slot in the door. This suggests a finding that the rent was not accepted with full knowledge

### ORDER ON PETITION TO REHEAR

Appellants, Arthur Jack Ross and Barbara Wheeler Ross, filed a Petition to Rehear pursuant to Rule 39 of the Tennessee Rules of Appellate Procedure. Under Rule 39(a), "[a] rehearing will not be granted to permit reargument of matters fully argued." All matters raised in the Petition to Rehear were fully argued by the parties, considered by this Court, and sufficiently addressed in out Opinion. We find, contrary to Appellants' insistence, that our Opinion does not misapprehend any material facts in the record or propositions of law.

Appellants' Petition to Rehear is a DENIED. Costs related to this Petition to Rehear are assessed to the Appellants, Arthur Jack Ross and Barbara Wheeler Ross.

---

of the alleged default. However, due to our conclusion that the state statute is preempted in this case, we need not decide whether the Trial Court's conclusion in this regard was correct.